RECEIVED
AUG 12 2005
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 04-50140 |
| versus | JUDGE HICKS |
| THOMAS CHRISTIE | MAGISTRATE JUDGE HORNSBY |

## REPORT AND RECOMMENDATION

The issue in this case is whether a search warrant authorizing agents to search Defendant's residence for evidence of child pornography also authorized the agents to search a home office located within that residence. For the reasons that follow, the court finds that the search of the entire structure, including the home office used by Defendant in his construction business, was supported by the probable cause outlined in the affidavit and was within the scope of the search authorized by the warrant. Therefore, it is it is recommended that **Defendant's Motion to Suppress (Doc. 26) be denied.**

On March 25, 2004, Magistrate Judge Roy S. Payne executed a Search Warrant authorizing the search of Defendant's residence for evidence of the possession, receipt and/or distribution of child pornography.[1] The warrant described the premises to be searched as

---

[1] A copy of the search warrant, the application for the search warrant and the supporting affidavit are attached as Exhibit 1 to the Government's Memorandum in Opposition to Defendant's Motion to Suppress, which, for ease of reference, was introduced into evidence at the hearing as Government's Exhibit 1 In Globo. Tr. 6-8.

follows: "Residence of Thomas Christie at 3418 Seminole Drive, Shreveport, Louisiana 71107. (SEE ATTACHMENT A)." Attachment A to the warrant describes the property in greater detail, such as a "single family, one level home," and includes additional information regarding the color and construction of the home, the location of a shed in the rear of the residence and the proximity of the home in relation to other homes on the street. *There is no reference in the search warrant or Attachment A to the home office.*

The affidavit in support of the search warrant shows, among other things, that Defendant's name, home address, telephone number, e-mail address and credit card information were contained in a membership list for child pornography websites. The address listed in the membership information for defendant is the same address as the property that is the subject of the search warrant – 3418 Seminole Drive, Shreveport, Louisiana, 71107. Affidavit, ¶ 34.

The affidavit establishes that Defendant's Time Warner internet access account and his CapitalOne MasterCard account list his address as 3418 Seminole Drive. Defendant's MasterCard account showed a $50.90 charge on June 7, 2003 which corresponded to Defendant's purchase of a membership to one of the child pornography websites. Affidavit, ¶¶ 40-42.

The affidavit further establishes that Defendant has a criminal history for oral sexual penetration of a child and interstate transportation of child pornography. Affidavit, ¶ 39.

Based on the information set forth in the affidavit, the agents sought authorization to enter "3418 Seminole Drive, Shreveport, Louisiana 71107, as specified in Attachment A," to search for items relating to child pornography. Affidavit, ¶¶ 43-44.

The warrant was executed the very next day, on March 26, 2004. Testimony from the hearing shows that the search was effected by federal agents with the assistance of state and local authorities. Tr. 11. When the agents arrived to conduct the search, no one was at Defendant's residence. According to Defendant's testimony, a deputy contacted him by telephone and told him that his house had been burglarized and asked Defendant to return home to meet the deputy. Tr. 47. When Defendant arrived at his home, he was met by agents who presented him with the search warrant. Tr. 48. Defendant then lifted his garage door and led the agents into his residence through a door (inside the garage) leading into his living room. Tr. 15-17, 32. A security sweep of the house was conducted, and then the search began. Tr. 20, 35.

Government's Exhibit 1 also contains a videotape of portions of Defendant's home on the day of the search. See Attachment 2 to Government's Exhibit 1. Tr. 7. From that video, as well as a video introduced by Defendant (which was taken on a subsequent date) [Defendant's Exhibit 3], and six still photographs of Defendant's residence [Joint Exhibit 1], together with the testimony of the witnesses, Defendant's residence can be described as follows. The residence is a modest home with large house numbers clearly designating the municipal address near the front door. Defendant does not use the front door, because the

screen door on that entrance remains locked. Tr. 74. Instead, Defendant enters his home by lifting the large pull-down garage door which then reveals two additional doors: a black door to the left which enters directly into the living room, and a white door about six feet to the right of the black door and directly in front of (or opposite) the pull-down garage door. Tr. 49, 69, 74, 77, 86. That second door enters directly into Defendant's home office.[2] By carefully examining the Government's videotape of the home on the day of the search (Attachment 2 to Government Ex. 1), that door to the office can be seen immediately to the left of the two refrigerators and behind several boxes located in the garage.[3]

On the day of the search (and when the Government's video was taken) the exterior door to the home office was blocked by a stack of boxes, a broom and other household items cluttered in front of that door. Defendant's video (Defendant's Exhibit 3) and the photographs taken by Defendant (Joint Exhibit 1) show that the exterior door to the home office bears a sign or placard with the name "Creative Home Improvement Services." Tr. 61. Because that door was marked, Defendant claims the agents knew or should have known that the room or area behind that door was not part of Defendant's residence and not within the scope of the search warrant. However, a very careful review of the Government's

---

[2] Defendant and his fifty-percent partner, Juan Elizondo, are in a construction or remodeling business named "Creative Home Improvement Services" or CHIS. CHIS does business from inside this home office. Tr. 75, 81-82. The home office was built out of part of the garage. Tr. 65.

[3] That door, which connects the home office to the garage, is referred to herein for simplicity as the exterior door to the home office. However, that door does not lead directly to the outside of the house; it leads to and from the garage. Tr. 64.

videotape taken on the day of the search [at approximately 14-16 seconds] shows that *the sign was not on that door on the day of the search.* Tr. 71-72. In fact, both Defendant and his business partner, Juan Elizando, testified that the sign was affixed to the exterior door with scotch tape and frequently fell off the door. Id. While Defendant testified that the sign was generally on the door, he could not say whether it was on there at the time the search started. Tr. 71-72, 79. Agent Podboy was not aware prior to the search that there was a business in the residence. Tr. 27-28.

The videos, photographs and testimony further show that the home office also can be entered through an interior door within the residence. Tr. 40-41. When that interior door is closed, a person approaching the door will see a sign on the door designating the area behind that door as the office of C.H.I.S. (Creative Home Improvement Services). That interior door opens outward into the living room. Thus, if that interior door is left open, the sign on the outside of that door cannot be seen by a person approaching the interior doorway to the home office. Tr. 65-66.

Agent Podboy, who was the Government's only witness at the hearing, did not recall seeing the white door leading from the garage into the home office (Tr. 39)[4], and he did not know whether the interior door to the home office was open or closed when the search team first entered the residence. Tr. 37-38. However, it was not locked. Tr. 38. Agent Podboy testified that Defendant suggested he and the agents meet in the home office in order to

---

[4]Defendant argues that the "odds against this [Podboy not noticing the full size white door] would make even the most reckless of gamblers cringe." Argument, p. 4.

shield Defendant's wife from the conversation. Tr. 19, 37. Defendant did not recall making such a suggestion. Tr. 57. In fact, according to the Defendant, his wife was not home at time, and she did not arrive until some time later. Id.

Mr. Elizando (Defendant's business partner) testified that he built the home office. Tr. 76. The evidence shows it is not a separate structure, and it is under the same roof as the one-level residence. Tr. 91. The court finds that if the garage door to the residence is pulled down into the closed position, there is nothing apparent from viewing the residence which would indicate to anyone that a construction company is operated from an office within the residence. Tr. 43, 72-73. Instead, the residence resembles most other middle-class family homes common throughout the North Louisiana area.

Defendant points out that there are signs affixed to the door of his pick-up truck and to the side of a flatbed trailer used in his business. Defendant's video also shows wheelbarrows, ladders and other construction-related tools located on the side of the residence and near the storage shed in the back yard. However, none of those tools is inconsistent with tools and garden implements found in many yards in this area. Moreover, when the agents arrived to conduct the search, Defendant was not present, and his pick-up truck bearing the company's sign was not in the driveway. In any event, many employees bring their work-related vehicles home in the evenings, and the mere presence of a vehicle or small flatbed trailer bearing a company's designation would not necessarily lead a

reasonable agent to believe that a business is being conducted from a home office within the residence.

Mr. Elizando testified that he enters the home office each morning through the exterior door to the home office located in the garage. Tr. 86. According to Mr. Elizando, Defendant lifts up the garage door each morning, thereby permitting Mr. Elizando and the other employees access to the home office through the home office's exterior door.

The court finds Mr. Elizando's testimony on that point is not credible. The video taken by the Government on the morning of the search shows that the exterior door into the home office is blocked and generally inaccessible. A person attempting to enter the home office through that door on the morning of the search would have been required to move several boxes and other household items to gain access to the door. Furthermore, the video taken by the Government on the morning of the search shows that a small sofa or loveseat is located inside the home office (up against that door) and blocks ingress or egress through that door. When confronted with that information on cross-examination, Mr. Elizando testified that Defendant would move that sofa or loveseat each morning to enable Mr. Elizando and the other employees to enter through the home office. Tr. 87. Again, that testimony is not credible and defies common sense. It is much more likely and probable that Mr. Elizando and the other employees entered the home office by first entering the residence through the garage (the black door) and then entering the home office through the interior door located inside the residence.

According to Agent Podboy, unlawful images of child pornography were found on Defendant's computer located inside the home office, as well as on a computer located outside of the home office in another area of Defendant's residence. Tr. 18. According to Agent Podboy, Defendant asked for permission to transfer his "Quickbooks" for his company onto a disk so he could continue to do business without his computer, and permission initially was granted, but the copying process was stopped when the agents discovered Defendant was attempting to run a program called "Evidence Eliminator." Tr. 21.

Defendant's motion to suppress (Doc. 26) alleges that the search team entered into "a separate dwelling locked and clearly marked as a separate place of business on both the exterior and interior doors." Motion to Suppress, ¶ 3; Argument In Support of Motion to Supress, p.1. However, the agents did not enter into a separate dwelling. The office at issue in this case is simply a room within the same structure. Thus, the analysis in this case would be the same if a spare bedroom had been converted into a home office. (Here, the home office was built out of part of the garage. Tr. 65.) Simply scotch-taping a business sign to the door of that spare bedroom does not somehow turn that room into a separate unit, building or dwelling for purposes of the Warrant Clause of the Fourth Amendment.

Defendant's motion also argues that the doors were locked and that the area was "clearly marked as the offices of C.H.I.S. Creative Home Improvement Services." The motion adds: "This area clearly contained items and equipment consistent with a separate business and not a residence which to be the target of the warrant." Motion to Suppress, ¶ 3. Again, the facts do not support Defendant's contentions. The court finds that, on the day

of the search, the white exterior door from the garage into the home office was not marked. If there was a sign on that exterior door at any time prior to the search, the sign was removed or had fallen off (as it was prone to do) before the search. The interior door into the home office does bear an office designation on the outside of that door. However, that designation is not visible if that interior door is left open (Tr. 66), and there is no evidence in this case that the door was closed.[5] Even if it was closed and locked, however, and the agents saw the placard on the outside of the door, the court finds that a search warrant supported by probable cause to search the residence for child pornography included authorization to enter and search that room.

At the suppression hearing, Defendant went to lengths to establish that C.H.I.S. is a legitimate business with all appropriate licenses, zoning and occupancy permits and that C.H.I.S. pays rent to Defendant for use of the home office. Defendant points out that when the search was conducted, the agents should have noticed those licenses and certificates hanging on the walls of the home office and should have been on notice that a search of the home office was outside the scope of the warrant. However, the videotape of the home office at the time of the search shows that the layout and items located in the home office are similar to many spare rooms in homes that contain computer desks, recliners, televisions, family photographs and the like. The primary difference is the existence of the occupational licenses, permits and certificates hanging on the walls. But there is no reason to expect

---

[5] Defendant's reply and supplemental memoranda allege that the agents kicked in the interior door to the home office. However, there was no evidence at the hearing to support that allegation, and Agent Podboy specifically denied that any doors were kicked. Tr. 12.

federal agents, who are searching for items relating to child pornography, to inspect licenses and certificates hanging on the walls of the residence. Agent Podboy testified that he did not recall seeing those licenses or certificates on the wall.

Defendant argues it was not reasonable for the agents to ignore all indications of there being a separate and distinct office within Defendant's residence and thereby violate Defendant's Fourth Amendment rights by searching an area for which they had no warrant. Memorandum in Support of Motion to Suppress, p. 4. Defendant cites the Warrant Clause of the Fourth Amendment, which categorically prohibits the issuance of any warrant except one particularly describing the place to be searched and the persons or things to be seized. Maryland v. Garrison, 480 U.S. 79, 84 (1987). By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit. Id.

The parties have not pointed the court to any decision that is directly on point with the facts in this case. Numerous cases are collected and summarized in 104 A.L.R.5th 165. Those cases, as well as those cited by the parties, reveal that the greater the degree of separateness of the area in question from the area described in the warrant, the more likely the courts will find that a separate warrant was required. Of course, while the Constitutional principle underpinning the Fourth Amendment cases is the same, it is the individual factual circumstances in each case that determines whether officers exceeded the scope of a warrant. Each case necessarily must be decided on its own facts.

In United States v. Kyle, 40 F.3d 519 (2nd Cir. 1994), one of the cases cited by Defendant, the court held that a search warrant authorizing a search of a residence also authorized a search of a locked bedroom within that residence. The room had no separate access; no doorbell; and no mailbox. Therefore, the agents had no reason to believe it was a separate residence, and the search of the room was valid. Defendant cites this case and tries to distinguish it on the grounds that, in this case, agents could not ignore all of the indications there was a separate and distinct office with the residence. Defendant cites the vehicles outside with their placards; the existence of the "clearly marked" exterior door between the garage and the office; and the "clearly marked" interior door to the office. As found above, however, Defendant's truck with the placard was not present when agents arrived to conduct the search; the sign on the exterior door to the garage had fallen off (or had been removed) before the search; and the sign on the interior door was not visible when that door was left open.

Two decisions the court finds particularly instructive are U. S. v. Prout, 526 F.2d 380 (5th Cir. 1976) and United States v. Kaye, 432 F.2d 647 (D.C. Cir. 1970). In Prout, the search warrant named the premises to be searched only as "Quick Sales Real Estate Office, 1001 Nunez Street, New Orleans, LA." According to Defendant, that description authorized a search only of the real estate office and not the search of an upstairs apartment bearing a separate municipal address. The office was in a one story building attached to a slightly taller two story building in which the apartment was located. The entrance to the real estate office on Nunez Street opened into a common foyer between that office and the downstairs

kitchen of the apartment, each of which had an interior door opening into the foyer. Neither interior door had any number or marking to identify the rooms located beyond them as separate premises. Within the apartment, there was a stairway from the kitchen to the room upstairs, where Defendant was arrested and the evidence in question was seized. The office and the apartment had separate utility meters, both of which were visible from the side street. Neither the affidavit nor the warrant mentioned the existence of the apartment or the street address for the apartment.

According to the Fifth Circuit, the determining factor as to whether a search warrant describes the premises to be searched with sufficient particularity is not whether the description given is technically accurate in every detail but rather whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched which is not the one intended to be searched under the search warrant. Id. at 387-388.

The Court found that the description of the premises to be searched was sufficient to validate the search of the apartment. The Nunez Street entrance gave access to both the real estate office and the apartment. Neither the exterior entrance to the building nor the interior door to the apartment and the office bore any municipal numbers or identifying marks to indicate the existence of two separate premises, so the executing officers could reasonably search the apartment as part of the premises described. Given the physical layout of the premises and the surveillance by the officers, a warrant describing the premises as "1001

Nunez Street" was sufficient so that there was little likelihood that the wrong premises would be searched.

This case bears several important similarities to <u>Prout</u>. The search warrant mentions only the residence and makes no mention of the office of C.H.I.S. When entering the home through the garage door and going through the living room, there is no indication that any part of the residence is designated for use by a company as a separate office – if there is no sign on the exterior door from the garage to the home office (and there was no such sign at the time of this search) and the interior door to the home office was open, thereby blocking the view of the sign on that door. In <u>Prout</u>, however, the upstairs apartment had a separate municipal address. The upstairs apartment in <u>Prout</u> also had a separate entrance on an adjacent street (which ran at a right angle to Nunez Street). Thus, this case is not as close as <u>Prout</u>. In this case, if the pull-down garage door to the residence is closed, there is no access to the home office from outside the home. Tr. 73-74. It is only by entering the home that the home office can then be entered, and that is either through the exterior garage door or through the interior door located within the home. Thus, despite Defendant's strenuous arguments to the contrary, the evidence does not support any contention that Defendant's home and home office are separate and distinct parts requiring separate search warrants.

<u>United States v. Kaye</u>, <u>supra</u> is also instructive on this point. Defendant was convicted of receiving stolen property of the United States. Pursuant to a search warrant, police searched defendant's store. However, they also searched Defendant's apartment located above the store. The building had two stories and a basement. Defendant's store and shop

occupied the first floor and the basement. On the second floor was an apartment that was occupied by defendant. A door opened from the street into the store. Next to this door and separated from it by a partition was a second door opening from the street on to a staircase which led to the second floor apartment. The store and apartment were separate and distinct; there was no door or direct passage between them. Signs announcing the nature of the business conducted in the store were across the entire width of the building, below the windows of the second floor apartment. Bills for gas, electricity and telephone service for both the first and second floors were sent to defendant. There were two electric meters, one for the second floor and one for the store, but there was only one gas meter.

The first district judge to hear the motion to suppress concluded that the search of the upstairs apartment was not authorized by the warrant. He rejected the argument that the scope of the search warrant was determined or broadened by the description of the premises contained in the supporting affidavit. Later, however, a second district judge heard and granted the government's motion to reconsider. He determined that the description of the premises in the search warrant was sufficient and that the search was valid.

The District of Columbia Court of Appeals reversed and held that the motion to suppress should have been granted. The store and apartment were not an integrated unit, but were two separate and distinct parts of the building. There was no access to the apartment from the store and no apparent connection between the two. According to the Court, such an arrangement is typical of that so frequently existing in urban communities, where living quarters are found over stores. When a store and apartment are thus arranged, a warrant

authorizing a search of the store can not be stretched to justify an intrusion into the apartment, regardless of the language in the supporting affidavit which might be construed more broadly.

By contrast, in this case, the home office and Defendant's residence are an integrated unit. Again, despite Defendant's arguments to the contrary, they are not two separate and distinct units. The home office is merely another room (that was built out of the garage) within Defendant's residence. Although Defendant's construction company pays him rent for the home office (Tr. 51), there was no evidence that the home office bears a separate municipal address, separate water or gas meters, etc. If the large garage door is pulled down, there is no indication that any business is being operated from a home office within the residence. Tr. 43, 72-73. Indeed, the licenses and permits introduced by Defendant show that municipal address for his construction business is the same as the municipal address for his residence – 3418 Seminole Drive. There is access to the home office from the residence (through two different doors) and, therefore, there is a direct connection between the two. The home office cannot be entered except by first entering the residence through its garage. Tr. 73-74.

Defendant's counsel has done an excellent job arguing and presenting this Motion to Suppress. But the underlying premise of the motion – that the home office is separate and distinct from the residence – is incorrect. After carefully reviewing the factual circumstances presented in this case, the court concludes that the agents did not exceed the scope of the warrant by entering into and searching the home office. Armed with a federal search warrant

to search Defendant's residence for evidence of child pornography, the agents acted reasonably in entering into and searching the home office located within that residence. The search of the entire structure, including the office, was supported by the probable cause outlined in the affidavit and was authorized by the warrant.

Accordingly,

**IT IS RECOMMENDED** that Defendant's Motion to Suppress (Doc. 26) be **DENIED**.

### Objections

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ. Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed.R.Civ.P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this the 11th day of August, 2005.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE

cc: Judge Hicks